Cite as 2020 Ark. 101

# SUPREME COURT OF ARKANSAS

No. CR-19-396

| | |
|---|---|
| | **Opinion Delivered:** March 5, 2020 |
| CAMERON HALLIBURTON | |
| APPELLANT | APPEAL FROM THE MILLER COUNTY CIRCUIT COURT |
| V. | [NO. 46CR-18-23] |
| STATE OF ARKANSAS | HONORABLE CARLTON D. JONES, |
| APPELLEE | JUDGE |
| | AFFIRMED. |

**KAREN R. BAKER, Associate Justice**

On November 29, 2018, appellant Cameron Halliburton was found guilty by a Miller County Circuit Court jury of first-degree murder and sentenced to life imprisonment. Halliburton's conviction stems from the November 26, 2017 death of Jarrod Klein in Texarkana. Halliburton appeals and presents five points: (1) the circuit court erred in denying Halliburton's motion to suppress his in-custody statement; (2) the circuit court erred in denying Halliburton's motion for mistrial based on a prejudicial outburst from the witness stand; (3) the circuit court erred in denying Halliburton's motion to dismiss the first-degree-murder charge; (4) the circuit court erred in excluding the testimony of Joe Conway pointing to a person as the killer of Jarrod Klein on the basis of relevancy and hearsay; and (5) the circuit court erred in denying Halliburton's motions for directed verdict. We affirm.

I. *Facts*

A summary of the facts is as follows.[1] Texarkana Arkansas Police Department patrol officer Marcus Luna testified that he responded to a report of a single-vehicle accident at 3:25 a.m. on November 26, 2017, at Linden and East Ninth Streets adjacent to the Family Dollar store (Family Dollar). The accident was reported through the 911 call system. When law enforcement arrived on the scene, officers discovered the accident was a homicide, and detectives were dispatched to the scene. Detective Wayne Easley of the Texarkana Arkansas Police Department testified that when he arrived at the scene in the early morning hours of November 26, 2017, Klein was in the truck that had been reported in the accident. The truck was against a tree immediately behind Family Dollar, and Klein appeared to have suffered multiple stab wounds. Law enforcement contacted Family Dollar to obtain surveillance videos from the property.

Detective Holly Smith of the Texarkana Arkansas Police testified that she obtained surveillance video from Family Dollar that showed the truck enter the parking lot and travel through the store's parking lot to where law enforcement found the truck. The video also showed a man later identified as Halliburton attempting to enter the front door of the

---

[1]Throughout the record, Halliburton and several witnesses are referred to by their nicknames:

- Halliburton is referred to as "Fish" or "Fishman."
- Jarrod Klein is referred to as "Pete" or "Petey."
- DeQueener Mitchell is referred to as "Queen."
- Gary Brown is referred to as "Duck."
- Haydon Crawford is referred to as "Bam."
- Joe Conway is referred to as "Little Joe."

store at 1:47 a.m. The video shows Halliburton falling into the door in his attempt to enter the store. The video further showed Halliburton walking toward the area where the truck was found.

Detective Smith further testified that after the video from Family Dollar was retrieved, law enforcement began to process the scene and located a receipt from the Flying J truck stop in the truck where Klein was found. Detective Smith testified that the receipt was dated and time stamped. Detective Smith testified that she obtained the Flying J surveillance video from the store, and law enforcement were able to identify the woman who left the store with the items on the receipt, DeQueener Mitchell.

Mitchell testified that she was friends with both Halliburton and Klein. Mitchell further testified that on the night of the murder, she went to the Flying J with Halliburton; Klein; her girlfriend, Tierra; and James Cherry. Mitchell testified that she panhandled until she got a man to buy her some pizza. After she retrieved the pizza, she went to her home with Halliburton, Klein, Tierra, and Cherry. Mitchell testified that the group ate pizza, smoked cigarettes, and smoked "thetic," synthetic marijuana, ("K2"). Mitchell testified that Halliburton had a knife with him when he was at her home that night and that Halliburton always carried a knife. Mitchell further testified that earlier in the evening, Klein and Halliburton were not getting along well, and Halliburton told Klein, "[Y]ou're not going to be running stuff." Mitchell testified that Halliburton and Klein left her apartment together between 11:00 p.m. and midnight. Mitchell suggested to law

enforcement that when looking for Halliburton, Halliburton may be at Andrew Glenn's apartment.

Curtis Flowers testified that he knows both Halliburton and Klein. Flowers also testified that he worked with Halliburton for a brief time. Flowers also testified that Halliburton often carried a knife; that on the night of the murder, Halliburton came to his house and had a black case with a knife in it; that Halliburton told Flowers that he had just stabbed and killed Klein in an altercation; and that Halliburton explained he had been asleep and woke up with Klein punching him in the face and an altercation ensued. Flowers further testified that Halliburton stated he had killed Klein and left him in the truck by Family Dollar, which is right by the motel.

Andrew Glenn testified that he is friends with Halliburton and Klein. Glenn testified that on the night of the murder, he was riding around in Klein's truck with Halliburton and Klein. Glenn testified that Halliburton and Klein were going to get some synthetic marijuana (K2), and Glenn asked to be dropped off at home. Glenn further testified that Halliburton returned to Glenn's home at 3:00 a.m. on the morning after the murder looking for a place to stay. Glenn testified that Halliburton "knock[ed] on my door frantic." Glenn testified that he could tell something was wrong with Halliburton and that Halliburton was distraught and nervous.

The morning following the murder, Mitchell accompanied Detective Easley and Detective Jason Haak to Glenn's apartment complex. Detective Easley testified that when he arrived at the apartment complex, someone in the parking lot approached him as he

4

was getting out of the vehicle and told him something was wrong with a man behind the dumpster. Detective Easley testified that he and Detective Haak went to investigate and discovered Halliburton squatted down—asleep—behind the dumpster. Detective Easley testified that Halliburton was wearing the same clothes that he was seen wearing in the Family Dollar surveillance video. Detective Easley further testified that while interviewing Halliburton, he saw blood on Halliburton's coat and that Halliburton had an empty knife sheath on his belt.

Arkansas State Crime Lab forensic serologist Kent Keedy testified that he received Halliburton's coat and tested the stains on the coat for the presence of blood, which tested positive. Arkansas State Crime Lab DNA technical leader Joseph Hof testified that the blood on the coat matched Klein's DNA profile. Hof further testified that the probability of someone unrelated to Klein having the same DNA profile as the blood on the coat was approximately 53.6 nonillion[2] in the Caucasian population. Detective Eric Winters with the Texarkana Arkansas Police Department testified that Halliburton's fingerprints were found on the passenger front door of the truck.

During the investigation, law enforcement interviewed Halliburton. Detective Easley testified that he interviewed Halliburton three times and Halliburton gave several different versions of what he thought happened that evening and implicated other people.

Dr. Stephen A. Erickson, pathologist and Deputy Chief Medical Examiner at the Arkansas State Crime Lab, testified that Klein sustained multiple stab wounds to his face,

---

[2] Hof testified that a nonillion is a one followed by thirty zeros.

eye, throat and chest. Dr. Erickson testified that some of the wounds were inflicted while movement was taking place and other wounds were inflicted after Klein stopped moving. Dr. Erickson testified that Klein died of multiple stab wounds, "but if there's any one that's associated with definitive mechanism of death, it's this stab wound to the chest that goes into the aorta."

Halliburton was charged with first-degree murder in the death of Klein. The jury convicted Halliburton as set forth above and this appeal followed.

II. *Points on Appeal*

A. Sufficiency of the Evidence

On appeal, Halliburton argues that the circuit court erred in denying Halliburton's motion to dismiss the first-degree-murder charge and that the circuit court erred in denying Halliburton's motions for directed verdict. Although Halliburton challenges the sufficiency of the evidence in his third and fifth points on appeal, "double-jeopardy considerations require this court to consider a challenge to the sufficiency of the evidence prior to the other issues on appeal. *Jones v. State*, 349 Ark. 331, 78 S.W.3d 104 (2002)." *Dortch v. State*, 2018 Ark. 135, at 5, 544 S.W.3d 518, 522. We will address both sufficiency-of-the-evidence challenges in one point.

1. *Standard of review*

On appeal, a motion for directed verdict is treated as a challenge to the sufficiency of the evidence. *Reynolds v. State*, 2016 Ark. 214, 492 S.W.3d 491. In reviewing a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the

State and consider only the evidence that supports the verdict. *Edmond v. State*, 351 Ark. 495, 95 S.W.3d 789 (2003). We will affirm a conviction if substantial evidence exists to support it. *Id.* Substantial evidence is that which is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without resorting to speculation or conjecture. *Dortch*, 2018 Ark. 135, at 5, 544 S.W.3d at 522. This court does not weigh the evidence presented at trial or assess the credibility of the witnesses, because those are matters for the fact-finder. *Id.* The trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Id.* Further, circumstantial evidence may provide a basis to support a conviction, but it must be consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *Edmond*, 351 Ark. 495, 95 S.W.3d 789. Whether the evidence excludes every other hypothesis is left to the jury to decide. *Carmichael v. State*, 340 Ark. 598, 12 S.W.3d 225 (2000).

### 2. *Law and analysis*

Halliburton was convicted of first-degree murder under Arkansas Code Annotated section 5-10-102 (Supp. 2019), which states in pertinent part:

(a) A person commits murder in the first degree if:

(1) Acting alone or with one (1) or more other persons:

(A) The person commits or attempts to commit a felony; and

(B) In the course of and in the furtherance of the felony or in immediate flight from the felony, the person or an accomplice causes the death of any person under circumstances manifesting extreme indifference to the value of human life;

7

(2) With a purpose of causing the death of another person, the person causes the death of another person[.]

A person acts purposely with respect to his or her conduct or a result of his or her conduct when it is the person's conscious object to engage in conduct of that nature or to cause the result. Ark. Code Ann. § 5-2-202(1). The purpose to commit a crime can be formed in an instant. *Tarentino v. State*, 302 Ark. 55, 786 S.W.2d 584 (1990); *Drennan v. State*, 2018 Ark. 328, at 7–8, 559 S.W.3d 262, 266. Intent is seldom capable of proof by direct evidence and must usually be inferred from the circumstances surrounding the killing. *Starling v. State*, 301 Ark. 603, 786 S.W.2d 114 (1990). The intent necessary for first-degree murder may be inferred from the type of weapon used, the manner of its use, and the nature, extent, and location of the wounds. *Garza v. State*, 293 Ark. 175, 735 S.W.2d 702 (1987).

With these standards in mind, we turn to Halliburton's arguments and review the testimony in Halliburton's case. Halliburton first argues that the State failed to prove that he was the person who killed Klein. Halliburton contends that the jury had to resort to speculation, and the circuit court erred in not granting his motion for directed verdict. Halliburton further contends that the circuit court erred in denying Halliburton's motion to dismiss the first-degree-murder charge, contending that the State failed to prove that Halliburton killed Klein purposely. Halliburton asserts that the record demonstrates that Haliburton was in a "drugged condition" from his use of synthetic marijuana (K2), that he

was asleep, and Klein woke him up by attacking him and beating him, and that Halliburton simply reacted in self-defense.

The State responds that Halliburton's challenge requests this court to reweigh the evidence presented at trial which is solely the function of the jury. The State further responds that Halliburton's argument is without merit, asserting that the jury can infer Halliburton's intent from the medical evidence: Klein was stabbed multiple times, including his face, neck and chest, vital parts of the body. The State also responds that Dr. Erickson's testimony—that several of the wounds were inflicted after Klein stopped moving—supports Halliburton's intent. In sum, the State contends that Halliburton's conviction and sentence are supported by substantial evidence and urges this court to affirm his conviction.

Turning to the facts in Halliburton's case, we must review the testimony presented. At trial, Mitchell testified that Halliburton and Klein were together on the night of the murder. Mitchell and Flowers both testified that Halliburton had a knife with him that evening. Mitchell and Flowers also both testified that Halliburton always carried a knife. Mitchell further testified that the two men were having a disagreement when they left her home that evening. Video-surveillance footage showed Halliburton at the scene at Family Dollar in the early morning hours of the murder and showed him leaving the store, heading toward Klein's truck. Detective Winters testified that Halliburton's fingerprints were found on Klein's truck. Hof testified that Klein's blood was found on the jacket Halliburton was wearing on the evening of the murder. Flowers testified that in the early

morning hours of the night after the murder, Halliburton told Flowers that he had been in a fight with Klein and confessed to killing Klein with a knife. Dr. Erickson testified that Klein was stabbed to death seven times and that some of the wounds were inflicted after Klein stopped moving.

Despite Halliburton's arguments regarding reweighing the evidence, we must determine whether substantial evidence exists to support Halliburton's conviction. This court does not weigh the evidence presented at trial or assess the credibility of the witnesses, because those are matters for the fact-finder. *Dortch*, 2018 Ark. 135, 544 S.W.3d 518. The trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Id.* Further, a person acts purposely with respect to his or her conduct or a result of his or her conduct when it is the person's conscious object to engage in conduct of that nature or to cause the result. Ark. Code Ann. § 5-2-202(1) (Repl. 2013). Considering the preceding facts and circumstances, we hold that there is substantial evidence to support Halliburton's conviction and sentence, and the circuit court did not err in denying Halliburton's motions for directed verdict. We also note that Halliburton's arguments that he acted in self-defense were not made to the circuit court and will therefore not be considered here. We affirm the circuit court on Halliburton's challenge to the sufficiency of the evidence.

## B. Custodial Statement

For his next point on appeal, Halliburton contends that the circuit court erred in denying his motion to suppress his first custodial statement. Halliburton gave several

10

statements while in custody. On appeal, Halliburton challenges the first custodial statement, which was taken on November 26, 2017, after Halliburton was found by law enforcement behind the dumpster and later interviewed at the bi-state police station.

## 1. *Standard of review*

On review, we will reverse a circuit court's ruling on this issue only if it is clearly against the preponderance of the evidence. *Flowers v. State*, 362 Ark. 193, 208 S.W.3d 113 (2005). On review, "a statement made while in custody is presumptively involuntary, and the burden is on the State to prove by a preponderance of the evidence that a custodial statement was given voluntarily and was knowingly and intelligently made. *Flowers v. State*, 362 Ark. 193, 208 S.W.3d 113 (2005). In order to determine whether a waiver of *Miranda* rights is voluntary, knowing, and intelligent, this court looks to see if the statement was the product of free and deliberate choice rather than intimidation, coercion, or deception. *Id.* To make this determination, we review the totality of the circumstances surrounding the waiver, including the age, education, and intelligence of the accused; the lack of advice as to his constitutional rights; the length of the detention; the repeated and prolonged nature of the questioning; the use of mental or physical punishment; and statements made by the interrogating officers and the vulnerability of the defendant. *Id.* The evaluation of the credibility of witnesses who testify at a suppression hearing about the circumstances surrounding an appellant's custodial confession is for the trial judge to determine, and this court defers to the position of the trial judge in matters of credibility. *Id.* Conflicts in the testimony are for the trial judge to resolve, and the judge is not required to believe the

testimony of any witness, especially that of the accused, since he or she is the person most interested in the outcome of the proceedings. *Id.* So long as there is no evidence of coercion, a statement made voluntarily may be admissible against the accused. *Id.*" *MacKool v. State*, 365 Ark. 416, 436–37, 231 S.W.3d 676, 693 (2006).

## 2. *Law and analysis*

As he did at the circuit court level, Halliburton contends that he did not voluntarily, knowingly, or intelligently waive his *Miranda* rights but that he did give an incriminating statement to law enforcement. Further, although not totally clear, Halliburton seems to argue that the statement at issue was incriminating because during that interview, law enforcement learned that Halliburton was alone with Klein the night of the murder and law enforcement identified Klein's blood on Halliburton's jacket. At the suppression hearing, Detective Easley testified that after seeing Halliburton on the Family Dollar surveillance video, law enforcement was looking for Halliburton. Detective Easley further testified that Mitchell led law enforcement to Glenn's apartment complex. Detective Easley testified that when they arrived at the complex, a man approached them about a suspicious person behind the dumpster. Detective Easley testified he and Detective Haak found Halliburton sleeping behind the dumpster. Further, Detective Easley testified that the complex was in Texarkana, Texas, and Texas officers arrived shortly after Arkansas law enforcement in response to a suspicious-person call. Detective Easley testified that Texas law enforcement agreed to transport Halliburton to the bi-state building while Detective Easley transported Mitchell in his car. Detective Easley testified that he found

Halliburton behind the dumpster at approximately 2:30 p.m. and read him his *Miranda* rights at 3:01 p.m., confirming that he had the right to remain silent, that he could talk to an attorney, and that the questioning could stop anytime. Halliburton initialed each of these rights on the statement-of-rights form and signed it. Detective Easley testified that he witnessed Halliburton sign the form and that Halliburton did not leave the room during the interview. Detective Easley testified that Halliburton told Easley he had smoked synthetic marijuana (K2) but that the effects only last about 15–20 minutes and that he said he "was normal." Further, Detective Easley testified that Halliburton acted normal, and was not unusually emotional. Detective Easley testified that approximately twenty minutes into the interview he told Halliburton that Klein had been murdered and Halliburton was upset upon learning that news.

At the suppression hearing, Halliburton testified that on the morning of the murder, he left Glenn's apartment to go purchase more synthetic marijuana. Halliburton testified he returned to Glenn's apartment to smoke, but no one answered the door and he "wanted to smoke some so I got behind the dumpster and I smoked and ended up going to sleep." Halliburton testified he was asleep behind the dumpster with synthetic marijuana (K2) in his hand when he was awakened by officers. Halliburton stated that he awoke to an officer tapping his foot and that the officers had their guns drawn when they awakened him. Halliburton testified that he had been in a wreck the night before and that he thought officers wanted to talk to him about leaving the wreck. Halliburton testified that he spoke with officers and went to the bi-state building with law enforcement to be

13

interviewed and did not feel forced to go; in fact, he agreed to go. Halliburton testified that Detective Easley helped him off the ground and Halliburton agreed to go speak with law enforcement.

Ruling from the bench, the circuit court denied Halliburton's motion to suppress and made detailed oral findings. The circuit court examined each of the relevant factors to determine whether the statement was voluntary and was knowingly and intelligently made; the court concluded that the State had met its burden to show that it was admissible. Specifically, the circuit court found that Haliburton was advised of his constitutional rights and the record shows that Halliburton signed the waiver form; that the interview occurred immediately after Halliburton was discovered behind the dumpster, and the period of detention was not prolonged; that there was no evidence to support an argument regarding intimidation or coercion by law enforcement; that there was no evidence to support an argument regarding Halliburton's allegation that Texas officers threatened to arrest him for possession of a controlled substance; and that "there's not been any evidence presented at this hearing wherein Mr. Halliburton stands charged in Bowie County, Texas District Courts or in Texarkana, Texas City Courts with the offense of possession of a controlled substance." Further, the circuit court found that Halliburton could read and write and had his GED. The circuit court also found that while there was evidence that Halliburton had smoked synthetic marijuana (K2), Halliburton informed Detective Easley that the high lasted less than thirty minutes and that he was "normal" at the time of the interview and

had used the marijuana a few hours before he signed the form. In sum, based on the totality of the circumstances, the circuit court denied Halliburton's motion to suppress.

On appeal, Halliburton argues that the circuit court erred by not suppressing the statement. Specifically, Halliburton contends that the interview was taken within minutes of Halliburton being aroused from a "drug induced stupor and following a car wreck; after he was threatened with arrest in Texas [for possession of synthetic marijuana] if he did not go with the Arkansas detectives; before he was informed of the reason why detectives wanted to talk to him; and before he was arrested after being transported to Arkansas. His choices were either get arrested or come talk to us." In other words, Halliburton points to the fact that he was in "a drug induced stupor," that he had been in a car wreck the night before, and that he had been "threatened" with arrest in Texas for possession of synthetic marijuana if he did not go with the Arkansas police officers. Halliburton further asserts that Detective Easley contradicted his own testimony during the pretrial hearing that Halliburton had been informed that he was being interviewed as a suspect in a homicide and later testifying that he advised Halliburton that he was not a suspect. Halliburton contends that Detective Easley's conduct qualifies as deception and urges this court to reverse.

In *Bryant*, we affirmed the circuit court's denial of Bryant's motion to suppress. As discussed above, "in order to determine whether a waiver of *Miranda* rights is voluntary, knowing, and intelligent, this court looks to see if the statement was the product of free and deliberate choice rather than intimidation, coercion, or deception. *Flanagan v. State*,

368 Ark. 143, 243 S.W.3d 866 (2006). To make this determination, we review the totality of the circumstances surrounding the waiver, including the age, education, and intelligence of the accused; the lack of advice as to his constitutional rights; the length of the detention; the repeated and prolonged nature of the questioning; the use of mental or physical punishment; and statements made by the interrogating officers and the vulnerability of the defendant. *Id.*" *Bryant v. State*, 2010 Ark. 7, at 11–13, 377 S.W.3d 152, 159–60. In *MacKool v. State*, 365 Ark. at 442, 231 S.W.3d at 696, we also employed the totality-of-the-circumstances evaluation and affirmed the circuit court's denial of MacKool's motion to suppress.

We are satisfied that the circuit court did not err in allowing Halliburton's custodial statements into evidence. Detective Easley advised Halliburton of his constitutional rights. Halliburton testified to the same, and the record shows that Halliburton signed the waiver form. The interview occurred immediately after Halliburton was discovered behind the dumpster, and the interview was not prolonged. The officers' use of weapons to awaken Halliburton was reasonable under the circumstances of a murder investigation. There is no evidence that Texas law enforcement threatened Halliburton with arrest to induce his statement. Further, Halliburton can read and write and has his GED. Also, Halliburton's argument regarding Detective Easley's deception that he had informed Halliburton that he was a suspect in a homicide misstates the record. Detective Easley informed Texas law enforcement—not Halliburton—that Halliburton was a suspect in a homicide. Detective Easley did not testify that he told Halliburton he was a suspect prior to the interview.

16

Having reviewed the totality of the circumstances, we conclude that the circuit court did not err in denying Halliburton's motion to suppress. Therefore, based upon the record before us and our standard of review, we affirm the circuit court.

## C. Mistrial

For his next point on appeal, Halliburton contends that the circuit court erred in denying his motion for mistrial. At trial, the State called Glenn as a witness. As Glenn left the witness stand, Glenn said, "Good luck in prison." Defense counsel heard the comment, but the prosecutor and the circuit court judge did not hear the statement. Halliburton requested that Glenn be held in contempt and that Glenn be admonished. The circuit court ordered Glenn to remain in the courtroom and released the jury for a break. Outside the presence of the jury, at Halliburton's request, the circuit court put Glenn back in the witness stand. The circuit court questioned Glenn, and he admitted he had made the statement. The circuit court admonished Glenn, held him in contempt, ordered him to thirty hours of community service, and excused him.  Halliburton moved for a mistrial but stated that he did not want a limiting instruction because he did not want to bring attention to the remark. The State responded that it did not hear the comment, and the State was seated closer to the jury. The State further responded that it was not clear that any of the jurors heard Glenn's statement, that Glenn's testimony demonstrated he believed Halliburton was guilty, and that the statement was a "sidebar comment." Accordingly, the State reasoned that a mistrial was not warranted.

17

The circuit court denied the motion for mistrial. The circuit court explained that polling the jury would do more harm than good and that because of the layout of the courtroom, Glenn was "well away from the jury. And it is unlikely that they heard what he said." The circuit court denied the motion explaining that "even if . . . the jurors potentially heard the statement it is [not] such a degree and nature that it would prejudice [Halliburton's] case to the point to where no other remedy would be appropriate. What I will do, however, is instruct the jury that in the event they heard any statement made that was not elicited in direct testimony from Mr. Glenn they are to ignore it and disregard it. And for those reasons I will overrule your motion for mistrial, okay."

## 1. *Standard of review*

"A mistrial is a drastic remedy and should be declared when there has been an error so prejudicial that justice cannot be served by continuing the trial, or when it cannot be cured by an instruction." *Travis v. State*, 371 Ark. 621, 625, 269 S.W.3d 341, 344 (2007). The grant or denial of a motion for mistrial lies within the sound discretion of the circuit court, and the exercise of that discretion should not be disturbed on appeal unless an abuse of discretion or manifest prejudice to the complaining party is shown. *King v. State*, 298 Ark. 476, 769 S.W.2d 407 (1989).

## 2. *Law and analysis*

Haliburton contends that the circuit court erred in denying his motion for mistrial, alleging that he was highly prejudiced by Glenn's "outburst." Halliburton asserts that on cross-examination, Glenn testified regarding Halliburton's "bloody fingerprint" in Glenn's

18

apartment the night of the murder and that this evidence was prejudicial to Halliburton. Halliburton argues that the case against him was strictly circumstantial, and allowing Glenn's testimony with his "bombshell" comment — "Good luck in prison" — was reversible error. Specifically, he argues that other than the blood on Halliburton's jacket, Glenn's testimony was the only evidence of blood and alleges that Glenn waited "to drop his bombshell allegation" the night of the murder and then later left the witness stand taunting Halliburton with his comment "[g]ood luck in prison." The State contends that Halliburton has mischaracterized the situation. The State further responds that the comment was so soft-spoken it was not clear whether the jurors heard the comment and that a mistrial was not warranted because the comment was not prejudicial, Glenn did not make a scene, and Glenn did not display emotion or disrupt the trial.

In *Richmond v. State*, 302 Ark. 498, 501, 791 S.W.2d 691, 693 (1990), Richmond contended that the circuit court erred in denying his motion for mistrial when "the wife of the victim had an emotional outburst during her testimony at the trial. After [the wife] identified [Richmond], she made the following unsolicited statement: 'God. How could you do that to him? You devil.'" The circuit court denied the motion for a mistrial but admonished the jury not to consider the emotional outburst when deliberating on the case and to follow the court's instructions on the law. *Richmond v. State*, 302 Ark. 498, 501, 791 S.W.2d 691, 693 (1990). We affirmed and explained,

> Appellant cites to *Venable v. State*, 260 Ark. 201, 538 S.W.2d 286 (1976), wherein we stated that emotional outbursts by the relatives of murder victims and by victims of crimes are not unusual and are difficult to control. He states we found

19

the trial court did not abuse its discretion in denying a mistrial in *Venable* because no accusatory remark or remarks were made at the accused. Here, he argues, Ms. Masters made accusatory remarks toward the appellant and for that reason, the mistrial should have been granted. We disagree.

In *Venable*, the outbursts were made by two witnesses, one of whom was a victim. One witness, after having identified the defendant at trial, then immediately exclaimed, "Oh, my God! Why, Lord, why Donnie, why Donnie, why? Why would anybody want to kill him (crying)." Obviously, the witness's remarks in Venable were prompted by her having identified the defendant. Nevertheless, while we viewed the witness's remarks as being nonaccusatory, this court's decision to uphold the trial court's ruling denying a mistrial turned on its deference to the trial court's discretion in these matters. In this respect, we said the following:

> The trial judge must have been aware of all that took place in his presence and was in a better position to evaluate the impact of these occurrences than anyone else. He had a wide latitude of discretion in the control of the trial. Utilization of the extreme and drastic remedy of declaration of a mistrial should be a last resort.

We have upheld the trial court's denial of motions for mistrial where a crime victim fainted in the presence of the jury, *King*, 298 Ark. 476, 769 S.W.2d 407, and where a relative of a crime victim made an emotional outburst during her testimony, *Venable*, 260 Ark. 201, 538 S.W.2d 286. Here, [the wife's] statement was spontaneous and unsolicited. After making such an outburst, she was excused from the witness stand and a recess was immediately called. After the recess, the trial court carefully admonished the jury not to consider the outburst in any way in their deliberation of the case. Under such circumstances, we cannot say the trial court abused its discretion in not granting the appellant's motion for a mistrial.

*Richmond*, 302 Ark. at 501–02, 791 S.W.2d at 693–94.

Here, the record does not support Halliburton's allegation that Glenn had an emotional outburst or made a scene. Further, the record demonstrates that it is unclear whether the jury heard the statement and that the court admonished the jury to not consider any statements that were not elicited as responses to questioning. Considering the

record before us and our standard of review, we are not convinced that Glenn's statement rose to the level of granting a mistrial. We affirm on this point.

## D. *Zinger* Evidence

For his final point on appeal, Halliburton contends that the circuit court erred in excluding the testimony of Joe Conway, alleging that his testimony would have pointed to someone else as the killer. Halliburton alleged that Conway would provide testimony to implicate Hayden Crawford in the murder. Halliburton relies on our holding in *Zinger v. State*, 313 Ark. 70, 76, 852 S.W.2d 320, 323 (1993), that a defendant is allowed to introduce evidence which points to a person besides the defendant as being guilty of the crime.

Halliburton proffered Conway's testimony to present evidence suggesting that Crawford may have killed Klein. Conway's testimony regarding Crawford is intertwined with the testimony of two other witnesses, Detective Easley and Rebecca London, Halliburton's former girlfriend and the mother of his two children.

First, with regard to Detective Easley, Crawford was initially involved in the investigation of Klein's death. As discussed above, the State called Detective Easley to testify and Easley testified that when law enforcement first saw the Family Dollar surveillance video, a member of law enforcement thought that the person in the video may have been Crawford. Detective Easley interviewed Crawford. Crawford stated he was not involved in the murder and provided Detective Easley with an alibi. Detective Easley testified that law enforcement confirmed Crawford's alibi.

Second, Rebecca London and her testimony are also intertwined with Conway's proffered testimony. Halliburton called London to testify. London testified that the day after the murder, Crawford, whom she testified she did not know and had not met before, went to her workplace, but London was not there. London further testified that two days later after Crawford attempted to visit her, she went to a motel where her friend Brooke was staying. London testified that she agreed to give Brooke and Crawford a ride. London testified that she did not know Crawford and that he was a stranger to her friend Brooke as well but had "showed up like out of nowhere." London testified that the three of them went back to London's house, and Crawford kept opening and shutting a knife he was carrying and pacing back and forth.

With these two witnesses' testimony in mind, we move to Conway's proffered testimony. Halliburton called Conway to testify. Conway testified that he was friends with both Klein and Halliburton. Conway further testified that he had never spoken with Crawford about Klein's murder, but Crawford had commented that he, Crawford, resembled Halliburton. Conway testified that he had engaged in an "indirect" conversation with Crawford about the case. The State objected, and the remainder of Conway's testimony was proffered.

Halliburton's proffer included the following: Conway's testimony that Crawford was living with him; that once Crawford realized London's connection to Halliburton, Crawford began wanting to give all of his possessions away and repeatedly apologized to Conway, but Crawford did not explain what he was apologizing for; and that Crawford

22

wanted to steal food stamps from London's car, but then apologized once Conway told him the food stamps were for the children Halliburton has with London. Conway also testified that Crawford was opening and closing his knife, "flicking" it open and closing it. Conway testified that a week after the murder, Crawford tried to give Conway his cell phone and Social Security card and was acting weird. Conway testified that he was at London's house with London, and Conway called his dad on the phone to have a witness because he felt threatened by Crawford. Conway testified that he made Crawford leave the house and that he was scared to be around Crawford. Conway testified that he posted a comment on FaceBook that he was "thinking about exposing you," which was not directed at anyone in particular. Conway testified that fifteen minutes after making the FaceBook post, Crawford "messes with me . . . it was like what are you talking about." The circuit court denied the admissibility of Conway's proffered testimony.

## 1. *Standard of review*

Circuit courts have broad discretion in deciding evidentiary issues, and their rulings on the admissibility of evidence are not reversed on appeal absent an abuse of discretion. *Laswell v. State*, 2012 Ark. 201, 404 S.W.3d 818.

## 2. *Law and analysis*

Halliburton relies on our holding in *Zinger*, 313 Ark. at 76, 852 S.W.2d at 323, that a defendant is allowed to introduce evidence that a person other than the defendant is guilty of the crime. The State responds that we should affirm the circuit court's ruling, contending that Conway's proffered testimony did not point directly to Crawford's guilt or

involvement in Klein's murder. The circuit court ruled that the testimony was not relevant, was not directly related to any conduct by either Halliburton or Crawford, and that the testimony was not rationally related or relevant to a fact in this case.

In *Zinger*, 313 Ark. 70, 852 S.W.2d 320, we discussed the standard for admissibility of evidence incriminating third persons and held that

> [a] defendant may introduce evidence tending to show that someone other than the defendant committed the crime charged, but such evidence is inadmissible unless it points directly to the guilt of the third party. Evidence which does no more than create an inference or conjecture as to another's guilt is inadmissible.
>
> . . . .
>
> [T]he rule does not require that any evidence, however remote, must be admitted to show a third party's possible culpability . . . [E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime.

*Zinger*, 313 Ark. at 75–76, 852 S.W.2d at 323 (quoting *State v. Wilson*, 322 N.C. 117, 367 S.E.2d 589 (1988)).

In *Walker v. State*, 353 Ark. 12, 17, 110 S.W.3d 752, 755 (2003) we explained our holding in *Zinger*.

> We have held that a defendant may introduce evidence tending to show that someone other than the defendant committed the crime charged, but such evidence is inadmissible unless it points directly to the guilt of the third party. Evidence which does no more than create an inference or conjecture as to another's guilt is inadmissible. [*Burmingham v. State*, 342 Ark. 95, 27 S.W.3d 351 (2000)]; *Zinger v. State*, 313 Ark. 70, 852 S.W.2d 320 (1993) (citing *State v. Wilson*, 322 N.C. 117, 367 S.E.2d 589 (1988)). This rule does not require that any evidence, however remote, must be admitted to show a third party's possible culpability; evidence of mere

24

motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt. There must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime.

In *Armstrong v. State*, 373 Ark. 347, 284 S.W.3d 1 (2008) (*Armstrong II*), we reaffirmed our holding in *Zinger* and held that it was consistent with the United States Supreme Court's holding in *Holmes v. South Carolina*, 547 U.S. 319 (2006).

Here, Halliburton's proffer does not offer any evidence to connect Crawford to the crime. The evidence did not show that Crawford was present at the murder, had threatened Klein or had any involvement with the perpetration of the crime, or was connected to the crime in any way. Accordingly, the evidence did not point to Crawford's guilt or link him to Klein's murder. Further, the circuit court has broad discretion, and based on the record before us, the circuit court did not abuse its discretion. We affirm on this point.

### III. *Rule 4-3(i) Review*

This case involves a sentence of life imprisonment; therefore, it is subject to review under Arkansas Supreme Court Rule 4-3(i). As required under Ark. Sup. Ct. R. 4-3(i), the record has been examined for all objections, motions, and requests made by either party that were decided adversely to Halliburton, and no prejudicial error has been found.

Affirmed.

*Phillip A. McGough, P.A.*, by: *Phillip A. McGough*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Brad Newman*, Ass't Att'y Gen., for appellee.