Cite as 2020 Ark. App. 522

# ARKANSAS COURT OF APPEALS

DIVISION III

**No.** CR-19-861

|  |  |
|---|---|
| | **OPINION DELIVERED:** NOVEMBER 18, 2020 |
| MOCHARIEE KEWANNA WEST<br>APPELLANT | APPEAL FROM THE GARLAND COUNTY CIRCUIT COURT [NO. 26CR-17-206] |
| V. | HONORABLE JOHN HOMER WRIGHT, JUDGE |
| STATE OF ARKANSAS<br>APPELLEE | AFFIRMED |

## ROBERT J. GLADWIN, Judge

Mochariee Kewanna West was convicted in the Garland County Circuit Court of manslaughter and robbery. On appeal, she argues that the circuit court erred in denying her motion for directed verdict. We affirm.

### I. *Facts*

West was charged by amended information with robbery, manslaughter, and hindering apprehension or prosecution. The State alleged that on January 15, 2017, West, acting with Malik Blevins and Quadryon Gipson, arranged to meet Dylan Carpenter and steal marijuana from him. During the course of the robbery, Carpenter shot and killed Gipson. West was alleged to have given false information to law enforcement during their investigation.

At the jury trial held April 3 and 4, 2019, Hot Springs police officer Bryan Caldwell testified that he was at work on the night of the shooting and was called to the scene after

shots were fired at the Behind the Mall Cinema. While there, he was notified that a gunshot victim had arrived at St. Vincent Hospital, and Officer Caldwell immediately went to the hospital. He said that while at the hospital parking lot, he talked to Blevins and West. West told him that she had been at the movie theater waiting in her vehicle to pick up her brother when the incident took place, and she transported Gipson and Blevins to the hospital. Officer Caldwell said that he took Blevins to the police department that night and that West drove herself to the police department. He said that Blevins had a limp and that when asked, Blevins said he has an old basketball injury. At the police department, Officer Caldwell found that Blevins had been shot in the knee, and an ambulance was called to evaluate him.

Kashmere Hall testified that she worked with Carpenter at Kroger from August 2016 to January 2017. She said that she had been friends with Gipson for years but that Carpenter and Gipson did not know each other. At Carpenter's request, she posted a picture of Carpenter's marijuana on Snapchat because Carpenter was looking for more people to buy it. Gipson asked her who owned the marijuana, and she told him who owned it and how much it would cost. Gipson asked her for Carpenter's number, and she gave it to him. She said that later, Gipson said he might take the marijuana from Carpenter instead of buying it. She said she did not care at first "how it was gonna go." She said that on the day of the shooting, she called Gipson, and he told her he was going to buy it rather than steal it.

Malik Blevins testified that he had gone to high school with Gipson. In January 2017, Gipson texted him stating that he knew someone with a "lot of weed" and asked if he wanted to "go take it." Blevins told Gipson yes, and Gipson told him to find a female

2

"because we was gonna act like a female that was getting the weed." Blevins then texted West. Blevins testified,

> Well, I had texted her and asked her if she would take me and [Gipson] to go take some weed from somebody. And so she came and picked me up and we went and got [Gipson] and went to the mall. And when we got to the mall, me and [Gipson] was talking about if we was gonna use the BB gun and stuff. And we decided no, we was just gonna beat him up and take it.

Blevins said that West's brother, Donelle, was also in the car with them. He said that West was driving, Donelle sat in the front passenger seat, Blevins sat in the back seat behind Donelle, and Gipson sat in the back seat behind West. He said that he and Gipson had both been texting Carpenter "like we was a female." They had West call Carpenter and tell him to meet them at the movie theater. Once they arrived in the theater parking lot, Carpenter walked up to West's window, and he was told to go to Blevins's door on the back-passenger side. Blevins said,

> Well, I open my door and I leaned my legs out. And when I had leaned my legs out, [Gipson] had got out the car and walked around and that's when I asked [Carpenter] to see the weed and that's when [Gipson] reached for it and [Carpenter] shot.

Blevins said that after Carpenter shot Gipson, Carpenter ran back up to their car, shot Blevins in the knee, and took off running. Blevins said that he got out of the car, put Gipson in the car, and they took him to the hospital. When they arrived at the hospital, people came out and took Gipson inside. Blevins did not tell anyone he had been injured, and when he was questioned, he did not tell police the truth about what had happened. He said that after he was taken to the police station to be interviewed, police realized he was injured, and he was taken by ambulance to the hospital. He said that police kept his phone that night.

3

On cross-examination, Blevins said that the BB gun they had in the car with them must have fallen out of the car when he jumped out to get Gipson because they had decided not to use it. He said that Gipson did not have the BB gun in his hand when Carpenter shot him. He also said that the text from him to West about robbing someone came before he asked her to pick them up so that they could go get some weed. He said that he and West never had a conversation about her helping them rob someone.

During the course of the trial, a videotaped interview of West was admitted and played for the jury. In the interview, West told police that she did not see what happened at the theater parking lot and that she was there to pick up her brother from the movie. She said she heard gunshots and saw somebody waving and saying they needed a ride to the hospital. When the police interviewer told her that she needed to tell the truth and that he already knew that Blevins and Gipson were in the car with her and had planned to meet someone to sell him dope, West said that she did not see anything because she had her head down and was on her phone while the incident occurred. She said she had picked Blevins up near Walmart on Malvern Road and had picked Gipson up at his house. She said she was only told that they were going to pick up some weed or "selling the weed." She said, "I just heard weed. That's all I heard."

After West was arrested, she was interviewed a second time, and that videotaped interview was also played for the jury. In the second interview, West said that Blevins and Gipson called her on a three-way call and asked her to take them to "get bud, but I really didn't know what it was. I just said yes 'cause I heard gas money. I'm not gonna turn down no gas money." She said she took her brother with her and picked them up. She said they

4

went to the movies and parked, then Carpenter came up to the truck. She said she did not use Blevins's phone to call Carpenter. Later in the interview, she admitted that she called Carpenter and told him, "Hey, I'm at the movies." However, she denied that she knew Blevins and Gipson planned to rob Carpenter that night.

The State introduced a report from Sergeant Russ Rhodes of the Arkansas State Police. Rhodes has been trained on downloading content from cell phones and other electronic equipment. He was given three cell phones to download in this case—phones belonging to Gipson, Blevins, and Carpenter. He prepared an extraction report of the instant-message call logs and chats between Blevins and Gipson, and it was admitted into evidence. He said that the two men discussed via text message a robbery to obtain marijuana. Gipson explained via text that he had an application on his phone that made the target believe he was talking to a female and that he needed a female driver. They discussed whether the victim might be armed and whether to bring Gipson's BB gun. A discussion between the two on January 15, 2017, entailed whether to involve Kash, another woman, or if West was on her way. When it was established via text that West was on the way, Gipson instructed Blevins to have West call Carpenter and tell him her name was Kylie, to say she was "almost there," and to find out what car he was driving. Blevins texted back to say that West just got off the phone with Carpenter.

Sergeant Rhodes also described chats between Blevins and West, and a second exhibit was admitted that contained communication from Blevins's phone. On January 12, 2017, Blevins sent West a message, "I'm about to rob somebody, though." West responded, "LMAO. Give me a minute." Then she sent, "LMFAO. Who?" Blevins responded,

5

"Some little white boy." Twelve to fourteen hours later, the next text between them is from West, and she asked Blevins, "You get it?" On cross-examination, Rhodes testified that it was his opinion that West could be asking about the robbery the night before. Rhodes said that Blevins told West on January 12 that he was going to rob somebody. Rhodes testified, "From that string forward, I didn't see any text from [West] where she asked who was going to be robbed, where they would get robbed, how they would get robbed, and what they would get robbed of."

After the State rested its case, the defense moved for a directed verdict, arguing that the State did not prove West had knowledge that the robbery was going to take place. The circuit court denied the motion. At the close of the trial, the jury returned with a guilty verdict on both robbery and manslaughter. West was sentenced to five years' imprisonment for robbery and three years' imprisonment for manslaughter, with the sentences to run concurrently. This appeal timely followed.

II. *Standard of Review*

West argues that the circuit court erred in denying her motion for directed verdict, wherein she claimed that the State did not prove she had knowledge a robbery was going to take place. A motion for directed verdict is treated as a challenge to the sufficiency of the evidence. *Green v. State*, 2020 Ark. App. 320, at 1–2, 601 S.W.3d 463, 465 (citing *Halliburton v. State*, 2020 Ark. 101, 594 S.W.3d 856). In reviewing a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the State and consider only the evidence that supports the verdict. *Id*. We will affirm a conviction if substantial evidence exists to support it. *Id*. Substantial evidence is that which is of sufficient

force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without resorting to speculation or conjecture. *Id.* We do not weigh the evidence presented at trial or assess the credibility of the witnesses because those are matters for the finder of fact, which is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Id.* Further, circumstantial evidence may provide a basis to support a conviction, but it must be consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *Id.* Whether the evidence excludes every other hypothesis is left to the jury to decide. *Id.*

### III. *Discussion*

West argues the facts and contends that Blevins and Gipson approached her to take them to a movie theater to "get some bud," but she claims that they did not tell her about their plan to rob Carpenter. She contends that Gipson had been communicating with Carpenter via an application on his phone that allowed him to pretend to be a female. When arranging the meeting with Carpenter, Gipson put West on the phone to tell Carpenter where to meet. When they arrived at the parking lot, West was approached by Carpenter, who asked if she was trying to buy some "weed." She pointed to the back seat as she was playing a game on her phone. She contends that she had her head down when the events behind her took place.

West argues that the direct evidence of her involvement was Blevins's testimony. She asserts that Blevins denied West had any knowledge that a robbery was planned, and the statement she gave to police also denied her involvement in a conspiracy to commit robbery. Therefore, she claims the case against her was circumstantial.

7

West contends that the State mischaracterized the text messages between her and Blevins, and the circuit court misunderstood them when it ruled on the motion for a directed verdict. She argues that the first message between her and Blevins was on January 10, when Blevins asked, "You Kan (sic) take me to the house & I'll give you gas money?" She argues that this request is the key to understanding the next few exchanges. West responded to Blevins, "You ready?" The next text is on January 12, when Blevins asked, "You kall (sic) me lastnight (sic)?" West replied, "[Y]ea. I did for that 20 if you get it." She argues that she was asking for twenty dollars—the gas money mentioned on January 10. Blevins replied that the "one" with the money got off work at 5:00 p.m. West asked for assurance that she was going to get her money when she texted, "You still got me," and Blevins replied, "Yes Mam." West then texted after 5:00 p.m., "You got that yet?" Blevins replied, "Hell nah mane!! This n---- playing," then, "I'm boatta rob somebody tho." West responded, "LMAO gimme a min." When asked who he planned to rob, Blevins replied, "Some lil white boy."

On January 13 at 9:30 a.m., West asked, "You get it?" Blevins did not respond until 2:30 p.m., "My fault n---- my ass was bar'd & went to sleep!![1] But ask Djuan if they ever got that last night." West replied, "He said no dude was being scary." West argues that more texts were exchanged that afternoon regarding Blevins obtaining money for West. At 12:01 a.m. on January 14, West texted to Blevins, "U get it." Blevins replied, "No n---- this n---- still bullsh----- n----! But N---- ain't already got her!!" Around 2:00 a.m., West

---

[1]Sergeant Rhodes testified that "bar'd" meant that he had taken a Xanax and fallen asleep.

texted, "Yeah, but it was for the gas so I can take her back tomorrow." Around 4:00 p.m., West texted, "He still ain't give it to you." Blevins replied, "Mo . . . word to the 5 this n---- is playing w me dawg." West contends that the conversations about the gas money ended there. The texts on the day of the charged incident relate only to the logistics of picking up Blevins; after he was in the car with West, they did not text anymore.

West contends that the State's theory was that the text messages between her and Blevins were discussions about a robbery, and West was asking Blevins if he had obtained the marijuana. However, she argues that this theory overlooks the messages sent before Blevins mentioned that he was going to rob someone. She claims that she was asking about the gas money he had promised on January 10 and that she was not asking him about drugs. She argues that she "didn't seem to care" what the source of the funds were—from Blevins himself, from him robbing a "lil white boy," or getting it from someone else who had to get it from his wife or girlfriend when she got off work—if it meant Blevins could finally give her what she was owed. She argues that in the context of obtaining gas money, she agreed to take Gipson and Blevins to get some "bud" because she heard there was gas money.

Thus, she argues that the circumstantial evidence in this case is not consistent with her guilt and inconsistent with any other reasonable conclusion. She claims that the only reasonable conclusion is that the text messages show that she kept asking Blevins for the money he had promised her on January 10. When that is added to the direct testimony of the alleged accomplice, Blevins, that West did not know he and Gipson were going to commit a robbery, and West's statement to the police, there was not substantial evidence

9

that would compel a jury to reach a conclusion with reasonable certainty without resorting to speculation that West had done any more than drive Blevins and Gipson to what she thought was going to be a drug deal where she could finally get the money she had been asking about for days.

We hold that substantial evidence supports West's robbery conviction. West was an active participant in, or an accomplice to, the robbery; thus, the circuit court did not err in denying her directed-verdict motion. Review of the sufficiency of the evidence of West's accomplice liability begins with her concession on appeal that she voluntarily drove Blevins and Gipson to the theater with the knowledge that she would be committing at least one crime—to get marijuana. Her argument for reversal is limited to her lack of knowledge of Blevins's and Gipson's plan to take the marijuana by force.

A person commits robbery if, with the purpose of committing a felony or misdemeanor theft or resisting apprehension immediately after committing a felony or misdemeanor theft, the person employs or threatens to immediately employ physical force upon another person. Ark. Code Ann. § 5-12-102(a) (Repl. 2013). A person is criminally liable for the conduct of another person when he is the accomplice of another person in the commission of an offense. Ark. Code Ann. § 5-2-402 (Repl. 2013); *Davis v. State*, 2013 Ark. App. 658, 430 S.W.3d 190. An accomplice is a person who, with the purpose of promoting or facilitating the commission of an offense, solicits, advises, encourages, or coerces the other person to commit it; aids, agrees to aid, or attempts to aid the other person in planning or committing it; or having a legal duty to prevent the commission of the

10

offense, fails to make a proper effort to do so. Ark. Code Ann. § 5-2-403 (Repl. 2013); *Davis*, *supra*.

When a theory of accomplice liability is implicated, we affirm the circuit court's order in a sufficiency-of-the-evidence challenge if substantial evidence exists to show that the defendant acted as an accomplice in the commission of the alleged offense. *Price v. State*, 2019 Ark. 323, at 5, 588 S.W.3d 1, 4–5 (citing *Cook v. State*, 350 Ark. 398, 86 S.W.3d 916 (2002)). We have said that there is no distinction between principals on the one hand and accomplices on the other, insofar as criminal liability is concerned. *Id*. When two people assist one another in the commission of a crime, each is an accomplice and criminally liable for the conduct of both. *Id*. One cannot disclaim accomplice liability simply because he or she did not personally take part in every act that went to make up the crime as a whole. *Id*.

The presence of an accused in proximity of a crime, opportunity, and association with a person involved in the crime are relevant facts in determining the connection of an accomplice with the crime. *Willis v. State*, 2018 Ark. App. 199, at 3, 546 S.W.3d 550, 552 (citing *Riley v. State*, 2009 Ark. App. 613, 343 S.W.3d 327). Corroborating evidence need not, however, be so substantial in and of itself to sustain a conviction. *Smith v. State*, 2012 Ark. App. 534, 423 S.W.3d 624. Rather, it need only, independently of the testimony of the accomplice, tend in some degree to connect the defendant with the commission of the crime. *Procella v. State*, 2016 Ark. App. 515, 504 S.W.3d 686.

West did not dispute that a robbery occurred. The jury heard testimony from Blevins admitting that he and Gipson planned the robbery and enlisted West's help in committing it. The evidence was that on January 12, 2017, three days before the robbery, Blevins texted

11

West that he was planning to rob somebody, and on the day of the robbery, Blevins called West and, as he testified, "asked her if she would take me and [Gipson] to go take some weed from somebody." Further, West told police that she had agreed to take Blevins and Gipson to "get bud."

On January 15, 2017, West and her brother picked up Blevins and Gipson and drove to the theater parking lot in order to get the marijuana. Blevins and Gipson planned and discussed the robbery from the back seat of West's vehicle; the conversation included her brother, who was in the front seat beside her. Part of the back-seat discussion was whether to use a BB gun and the decision not to use it. Although she denied hearing the plan or taking part in it, she told police that Blevins stated, "We just gonna take it." When Carpenter approached her vehicle, she directed him to talk to Blevins in the back seat. Blevins and Gipson then robbed Carpenter of his marijuana.

Further, before the robbery, Blevins and Gipson used a smart-phone application to lure Carpenter into believing that he was dealing with a female buyer. West aided in this ruse not only by driving her car to meet Carpenter but also by talking to him on the phone twice immediately before the robbery to complete arrangements to meet, including changing the meeting place to avoid a police car that was behind her vehicle. After the incident, West initially lied to police that she was not involved, telling two officers that she was at the movie theater to pick up her brother and that she transported the two shooting victims from the mall to the hospital. It is well settled that the acts, conduct, and declarations of a defendant before or after the crime, including inconsistent statements to the police, may

12

be considered as corroborating evidence. *E.g.*, *MacKool v. State*, 365 Ark. 416, 231 S.W.3d 676 (2006).

West's argument that the text messages were mischaracterized by the prosecution and misunderstood by the circuit court is a request for this court to reinterpret the substance of the text messages in a light more favorable to her. This ignores that only evidence supporting the verdict is to be considered on appeal. *Green*, *supra.* This court does not reweigh the evidence presented at trial. *Id.* Accordingly, we hold that there was substantial evidence presented to the jury to establish West as an accomplice to the robbery, and no error was committed by the circuit court in denying West's motion for a directed verdict.

Affirmed.

HIXSON and MURPHY, JJ., agree.

*Joseph C. Self*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *David L. Eanes, Jr.*, Ass't Att'y Gen., for appellee.