Cite as 2021 Ark. App. 31

# ARKANSAS COURT OF APPEALS

DIVISION IV
**No.** CR-20-169

| | | |
|---|---|---|
| JAQUAN LASLEY | | **Opinion Delivered** January 27, 2021 |
| | APPELLANT | APPEAL FROM THE JEFFERSON COUNTY CIRCUIT COURT [NO. 35CR-17-308] |
| V. | | |
| STATE OF ARKANSAS | | HONORABLE ALEX GUYNN, JUDGE |
| | APPELLEE | AFFIRMED |

## N. MARK KLAPPENBACH, Judge

Appellant Jaquan Lasley was convicted by a jury of first-degree battery against his girlfriend's eighteen-month-old son, JM. The child had sustained, among other injuries, a swollen and blackened eye, a skull fracture, a broken arm, burns from what appeared to be a cigarette lighter, and a bite mark on his abdomen. On appeal, appellant challenges the sufficiency of the State's evidence that he was the person who battered JM. We affirm.

In reviewing a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the State and consider only the evidence that supports the verdict. *Halliburton v. State*, 2020 Ark. 101, 594 S.W.3d 856. We will affirm a conviction if substantial evidence exists to support it. *Id*. Substantial evidence is that which is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without resorting to speculation or conjecture. *Id*. We do not weigh the evidence presented at trial or assess the credibility of the witnesses because those are matters for the

finder of fact, which is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Id.* Further, circumstantial evidence may provide a basis to support a conviction, but it must be consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *Id.* Whether the evidence excludes every other hypothesis is left to the jury to decide. *Id.*

The State charged Jaquan with one count of first-degree battery of JM pursuant to Arkansas Code Annotated section 5-13-201(a)(9) (Repl. 2013), alleging that the battery took place on or between April 1 and May 12, 2017. During that period of time, JM lived in a two-bedroom apartment with his mother, Kyeshia Ford; his six-year-old brother, LM; his five-year-old sister, MM; his mother's sister, Kandiss Ford; and his mother's boyfriend, appellant Jaquan Lasley. Jaquan, who was unemployed, had lived in the apartment a few months, moving in sometime around January 2017. Jaquan and JM slept in Kyeshia's bedroom; JM slept in a playpen on the carpeted floor. Kandiss slept in the other bedroom, and the older children slept in the front room.

Both Kyeshia and Kandiss were employed. Kyeshia would typically work the 2:00 p.m. to 10:00 p.m. shift or the 10:00 p.m. to 7:00 a.m. shift. Kandiss typically worked a 10:00 p.m. to 6:00 a.m. shift and slept during the daytime, mostly keeping to herself in her bedroom. Before Jaquan moved in, Kandiss or a neighbor named Charlotte would help care for JM when Kyeshia was working, but after Jaquan moved in, he became the children's primary caretaker when Kyeshia was at work. Oftentimes, Jaquan would drive Kyeshia's vehicle to take Kyeshia to and from work and take LM and MM to and from school.

Kandiss did not like Jaquan. She had seen him whip LM with a belt after LM urinated on himself. She thought this was inappropriate discipline of her nephew. Kandiss, however, never actually witnessed Jaquan physically abusing JM.

Kyeshia, who later pleaded guilty to the crime of permitting abuse of her child, confirmed that Jaquan had been keeping the children while she and her sister worked. She said Jaquan would get irritated and complain that JM cried a lot, and she said Jaquan "hollered at them all the time." Kyeshia believed that Jaquan had injured JM, having previously observed injuries on JM after he had been in Jaquan's sole care. She had asked Jaquan about JM's injuries, such as the bite mark on JM's stomach, but Jaquan would get mad at her; Jaquan would occasionally hit her and had previously bitten her. She had noticed that JM's arm seemed to be hurting him in April and that he was favoring it, but she did not realize that it had been broken. She admitted that she continued to leave JM in Jaquan's care because her sister and her neighbor were not available.

On Monday, May 8, 2017, JM's maternal grandmother, Tina Beard, took JM to the hospital because JM had been lethargic and throwing up for a couple of days. JM was given medication that helped with his vomiting but did not stop it entirely. Tina did not observe any injury or swelling to JM's eye that day.

On Friday, May 12, Jaquan drove JM and Kyeshia to the hospital in Pine Bluff to have JM's swollen eye looked at; Jaquan did not stay. The severity and number of injuries on JM prompted the initiation of an abuse investigation and JM's transfer to Arkansas Children's Hospital, where he was seen by Dr. Karen Farst.

Dr. Farst found multiple injuries on JM that included a healing upper left arm fracture that was typical of a child's arm being yanked, a healing round bite mark on his stomach that appeared to be from adult-sized teeth, a swollen and fractured skull, various abrasions, injuries appearing to be consistent with being struck with a belt, healing burns on his arm that were shaped like the top of a hot cigarette lighter, and a severely bruised and swollen eye. The doctor opined that the eye injury was likely inflicted within a few days and not the same day of JM's being brought to the hospital, JM likely suffered the head injury within the previous week, and JM's arm fracture was likely suffered within the previous two to four weeks. She opined that the skull fracture, located on the back lower portion of JM's head, was not consistent with falling out of a playpen onto a carpeted floor or other typical household falls; this injury was more common in blunt-force trauma. She said that nausea and vomiting are common in patients with a concussion. Dr. Farst diagnosed the child as having been subjected to physical abuse.

Tina, JM's grandmother, was convinced that Jaquan was the one who had abused JM. After JM was taken to and treated at the hospital, the Arkansas Department of Human Services (DHS) intervened to take emergency custody of the three children, who were ultimately placed in Tina's custody. Tina acknowledged that Charlotte Watson, Kyeshia's neighbor, kept the children at times, but Tina did not believe Charlotte would hurt the children. Since Tina had been given custody of the children, she had occasionally allowed Charlotte to care for them, and their Aunt Kandiss saw the children daily. In her testimony to the jury, Charlotte vehemently denied having caused any injuries to the children. No

4

more injuries to the children were noticed or reported since they had been removed by DHS.

Jaquan testified in his own defense and agreed that he had taken care of the children but denied having done anything to hurt JM. Jaquan had initially told a detective that he was the children's caretaker when their mother was at work. However, his story changed, and he said that Charlotte took care of the children a lot more than he did and that Kandiss or Kyeshia were often JM's caregivers. Jaquan told the detective that JM's injuries might have been caused by falling out of his playpen onto the carpeted floor. At trial, Jaquan theorized that Kandiss must have hurt JM's eye on the afternoon of May 12 in the brief time he was gone to drop off Kyeshia at her job and pick up LM from school.

In Jaquan's motions for directed verdict, the defense challenged whether he (Jaquan) was the perpetrator. Those motions were denied, the jury found Jaquan guilty, and this appeal followed.

Jaquan argues that the circumstantial evidence here does not exclude every other reasonable hypothesis and that the jury must have resorted to speculation to find him guilty of battering JM. Circumstantial evidence may constitute substantial evidence if it excludes every other reasonable hypothesis other than the guilt of the accused, and the jury is charged with making this determination. *Jenkins v. State*, 2020 Ark. App. 45, 593 S.W.3d 51. A jury is not required to lay aside common sense and may infer guilt from improbable explanations or incriminating conduct. *Id.*

We have affirmed child-abuse cases in which the appellant denied being the perpetrator and there was another adult who had access to the child and could have been

5

the perpetrator. In those cases, the accused offered an improbable explanation of the child's injuries that could not be reconciled with the medical evidence. *See Reams v. State*, 45 Ark. App. 7, 870 S.W.2d 404 (1994); *Payne v. State*, 21 Ark. App. 243, 731 S.W.2d 235 (1987). In contrast, we have reversed a father's conviction of battering his infant child when there was no direct evidence of his guilt, the two parents had exclusive access to the child in the relevant period of time, both denied hurting the child, neither accused the other of hurting the child, and there were no improbable explanations offered by the father. *Snow v. State*, 2018 Ark. App. 612, 568 S.W.3d 290. We concluded that it was equally plausible that the mother had battered the child, meaning that the jury was left to speculation and conjecture in entering a guilty verdict against Snow. *Id.*

It is not uncommon for the State's evidence to be circumstantial when the allegations are of child abuse, but the fact that evidence is circumstantial does not render it insubstantial. *See Deviney v. State*, 14 Ark. App. 70, 685 S.W.2d 179 (1985). The question whether circumstantial evidence excludes every other reasonable hypothesis other than guilt is usually reserved for the jury. *See Dycus v. State*, 2019 Ark. App. 385, 585 S.W.3d 167.

In this case, JM's mother and grandmother were convinced that Jaquan was the one who injured JM, Jaquan changed his story in an attempt to say that he spent much less time caring for JM, there was evidence that Jaquan had used inappropriate disciplinary force against LM and had bitten and hit Kyeshia, Jaquan offered improbable explanations for how JM was injured, other people who had access to JM denied having battered or abused him, and there was no evidence of physical abuse against JM before or after the few months that Jaquan lived in the apartment. The factfinder is not required to believe the testimony of the

6

accused because the accused is the person most interested in the outcome of the trial.  *See Adams v. State*, 2020 Ark. App. 107, 594 S.W.3d 884.  We hold that the State presented sufficient evidence from which the jury could conclude that Jaquan was the person who battered JM.

Affirmed.

HARRISON, C.J., and BARRETT, J., agree.

*William McNova Howard, Jr.*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Michael L. Yarbrough*, Ass't Att'y Gen., for appellee.