Cite as 2025 Ark. 150

# SUPREME COURT OF ARKANSAS
**No.** CR-23-401

|  |  |
|---|---|
|  | **Opinion Delivered:** October 16, 2025 |
| MORGAN WEATHERFORD<br>APPELLANT | APPEAL FROM THE LOGAN COUNTY CIRCUIT COURT<br>[NO. 42BCR-19-95] |
| V. |  |
| STATE OF ARKANSAS<br>APPELLEE | HONORABLE JERRY DON RAMEY, JUDGE |
|  | <u>AFFIRMED</u>. |

**KAREN R. BAKER, Chief Justice**

On December 16, 2022, a Logan County Circuit Court jury convicted appellant, Morgan Weatherford, of first-degree murder, residential burglary, and theft of property, for which he was sentenced to consecutive sentences of life imprisonment, twenty years' imprisonment with a $15,000 fine, and six years' imprisonment with a $10,000 fine, respectively. The jury imposed a ten-year-sentence enhancement for the commission of first-degree murder in the presence of a child.

On appeal, Weatherford presents four points: (1) the circuit court erred in denying his motions for directed verdict as to all counts and the sentence enhancement; (2) the circuit court erred in denying the motion to suppress his statements to law enforcement; (3) the circuit court abused its discretion in allowing certain autopsy photographs into evidence;

and (4) the circuit court abused its discretion by excluding mitigating sentencing evidence. We affirm.[1]

This appeal stems from the death of Rachel King on September 3, 2019. On September 9, Weatherford was charged with first-degree murder, residential burglary, and theft of property. On November 29, 2022, the State amended its information to include a sentence enhancement alleging that Weatherford had committed first-degree murder in the presence of a child. Weatherford's jury trial was held on December 12–13 and 15–16, 2022. The record before us establishes the following facts.

## I. *Facts and Procedural History*

On September 4, 2019, officers with the Booneville Police Department ("BPD") were dispatched to 66 West South Street in Booneville. Investigator Cody Smith with the BPD testified that, upon his arrival, two small children came running toward him saying, "[M]omma's dead, momma's dead." Smith testified that he called for backup after he looked through an open door and saw King, who was deceased, on the kitchen floor. Trial testimony established that, as officers were clearing the residence to ensure that no one else was inside, they located another small child alone in a bedroom with a "look of sheer terror on his face," and they took him outside. Weatherford was developed as a suspect early in the investigation because he had been in a relationship with King, and when officers arrived at the scene, one of the children stated, "Morgan killed my mother." Law enforcement was

---

[1]When Weatherford's appeal was initially before us, State's exhibit 81—a recording of Weatherford's full September 4, 2019 interview with the Arkansas State Police—was missing from the record. On April 17, 2025, we remanded the case to settle and supplement the record. *See Weatherford v. State*, 2025 Ark. 44 (per curiam). On April 29, a supplemental record containing State's exhibit 81 was filed.

2

advised to be on the lookout for a Ford Expedition that was missing from King's residence. Officers noticed a Ford Expedition matching the description of King's missing vehicle parked at a fast-food restaurant, and upon examining the vehicle, it was confirmed that the vehicle belonged to King.

The Arkansas State Police ("ASP") took over the investigation and executed a search warrant on King's residence. During this search, investigators found a broken window that had what appeared to be biological matter on it. Pieces of the broken window were submitted to the Arkansas State Crime Laboratory for testing. The ASP also received information regarding another residence in Booneville where Weatherford had been staying around the time of the murder, and Special Agent Corey Mendenhall testified that he participated in a search of the home. Mendenhall testified further that a pair of white shorts with what appeared to be blood on them was collected during the search and submitted to the state crime lab for testing. The homeowner, Sheila Lotvedt, informed law enforcement that she had previously given the shorts to Weatherford. At trial, Lotvedt testified that when she heard about what had happened to King, she informed law enforcement that a man who was a guest in her home the night of the murder may have been responsible for the murder. Lotvedt testified that Weatherford, who was an acquaintance of another guest in her home, returned to her residence between 11:30 p.m. and midnight, and because he was wearing shorts, she noticed that he had blood "all over his leg."

Later in the day on September 4, Weatherford was located in Conway and taken into custody on an unrelated warrant. Lieutenant Ben Villarreal with the BPD drove to Conway with another officer to facilitate Weatherford's transfer from Faulkner County to

Logan County. Villarreal testified that, on the drive back to Booneville, Weatherford asked why he was being arrested and what had happened to Rachel. Villarreal testified further that Weatherford suddenly began making comments to the effect of "that fucking bitch," "fuck you, you fucking bitch," and "just leave me, you fucking bitch." Villarreal testified that after fifteen or twenty minutes had passed, Weatherford reverted to his earlier questions, asking once again what happened to Rachel and why he had been arrested.

Shortly after 7:00 p.m., Weatherford was interviewed by ASP Special Agent Phillip Pierce in connection with King's murder. This interview was played for the jury. During the interview, Weatherford told Pierce that he and King had recently broken up after dating for over a year, but that prior to the breakup, Weatherford had lived in King's home with King and her three children. Weatherford denied any involvement in the murder, claiming that he had not been to Booneville since July 5. On September 5, Weatherford sat for a second interview with ASP Special Agent Josh Arnold and Investigator Albert Brown with the Logan County Sheriff's Office. Weatherford's story detailing his movements in the days leading up to the murder evolved over the course of the interview, and eventually, he confessed to King's murder. Weatherford stated that he went to King's home at approximately 4:00 p.m. on September 3 to spend time with King and her children, and that sometime later that day, King told Weatherford to leave. Weatherford explained that he left to go to McDonald's, and when he returned to King's home, the door was locked. Weatherford stated that he knew that King left a particular window unlocked, so he climbed through the window and cut his leg in the process. Weatherford entered a bedroom where one of King's children was awake and made his way through the home and into King's

bedroom where she was asleep. Weatherford shook King awake, and he stated that "her eyes got big" before she asked him, "[H]ow'd you get in my house?" Weatherford responded, "[D]on't worry about that, I'll fix it in the morning." Weatherford explained that he confronted King about their breakup, that King got out of bed, and that she began slapping him, hitting him, and attempting to shove him out of the room. Weatherford said it was then that he "fucking grabbed her by her fucking neck" and that King collapsed on him. Weatherford claimed that he straddled King in an attempt to pull her toward him, but she slipped out of his hands, and her head hit the floor because his hands were sweaty. Weatherford stated that one of King's children tried to come into the room and that he told him to go back to his room. Weatherford said that he eventually took King's vehicle and parked it at the fast-food restaurant before returning to Lotvedt's home. Weatherford said that, while claiming to be someone else, he called the BPD to report that he had "heard his cousin screaming" so that law enforcement would go check on King.

Kent Keedy, a forensic serologist with the state crime lab, testified that the white shorts collected from Lotvedt's residence tested positive for the presence of blood. Keedy testified further that he tested the pieces of the broken window for touch transfer and sent those samples to be tested for DNA. Jennifer Beaty-West, supervisor of the forensic DNA section at the state crime lab, testified that the major component of the DNA obtained from the blood on the white shorts was consistent with King's DNA. Beaty-West testified further that the DNA found on the broken window piece was consistent with Weatherford's DNA. Dr. Adam Craig, the associate medical examiner at the state crime lab who performed King's autopsy, testified that King's cause of death was hypoxic ischemic encephalopathy due to

5

strangulation and blunt-force head trauma. Craig explained that "encephalopathy" refers to damage or disease of the brain, and "hypoxic" and "ischemic" in this case means that King's brain did not get enough oxygen or blood flow. Craig described abrasions to King's neck, face, and jaw that were consistent with strangulation, as well as a spot of internal hemorrhaging on the inside of King's neck that was also consistent with strangulation. Further, Craig stated that the flattening of King's brain signified brain swelling and trauma from a lack of oxygen. When asked the approximate amount of time that King would have been strangled in order to cause her injuries, Craig stated that he could not say exactly, but in light of the brain swelling, it would have likely been one or two minutes. Craig explained to the jury that the autopsy also revealed hemorrhaging underneath the scalp, which led him to conclude that blunt-force injuries occurred in those areas.

At the close of the State's case, Weatherford moved for a directed verdict on all charges and the sentence enhancement, and the circuit court denied the motions. At the close of all evidence, Weatherford renewed his motions for directed verdict with respect to the theft-of-property, residential-burglary, and first-degree-murder charges. The circuit court denied Weatherford's motions once again.

On December 16, 2022, Weatherford was convicted and sentenced as described above. This appeal followed.

II. *Points on Appeal*

A. Sufficiency of the Evidence

For his first point on appeal, Weatherford contends that the circuit court erred in denying his motions for directed verdict as to all counts and the sentence enhancement.

6

In reviewing a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the State and consider only the evidence that supports the verdict. *Edmond v. State*, 351 Ark. 495, 95 S.W.3d 789 (2003). We will affirm a conviction if substantial evidence exists to support it. *Id.* Substantial evidence is that which is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other without resorting to speculation or conjecture. *Dortch v. State*, 2018 Ark. 135, at 5, 544 S.W.3d 518, 522. This court does not weigh the evidence presented at trial or assess the credibility of the witnesses, because those are matters for the fact-finder. *Drennan v. State*, 2018 Ark. 328, at 6, 559 S.W.3d 262, 266. The trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Id.* Further, circumstantial evidence may provide a basis to support a conviction, but it must be consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *Edmond*, 351 Ark. 495, 95 S.W.3d 789. Whether the evidence excludes every other hypothesis is for the jury to decide. *Carmichael v. State*, 340 Ark. 598, 12 S.W.3d 225 (2000).

### 1. *First-degree murder*

With these standards in mind, we turn to Weatherford's first point on appeal. Weatherford was convicted of first-degree murder. Pursuant to Arkansas Code Annotated section 5–10–102(a)(2), a person commits first–degree murder if with a purpose of causing the death of another person, the person causes the death of another person. Ark. Code Ann. § 5–10–102(a)(2) (Repl. 2024). A person acts purposely with respect to his or her conduct or a result of his or her conduct when it is the person's conscious object to engage in conduct

7

of that nature or to cause the result. Ark. Code Ann. § 5-2-202(1) (Repl. 2024). We have explained that "a criminal defendant's intent or state of mind is seldom capable of proof by direct evidence and must usually be inferred from the circumstances of the crime. Because intent cannot be proven by direct evidence, the jurors can draw upon their common knowledge and experience to infer it from the circumstances." *McCray v. State*, 2020 Ark. 172, at 5, 598 S.W.3d 509, 512 (internal citations omitted).

Weatherford contends that his September 5 statement to law enforcement demonstrated that he entered King's home to try to work things out with her, not to kill her. Weatherford argues that he and King merely "started tussling" and he did not know how badly she had been hurt. The State responds that the jury could infer that Weatherford acted with the requisite intent due to the nature of the injuries and his changing stories during the investigation.

We have explained that "[t]he intent necessary to sustain a conviction for first-degree murder may be inferred from the type of weapon used, from the manner of its use, and the nature, extent, and location of the wounds." *Mulkey v. State*, 330 Ark. 113, 117, 952 S.W.2d 149, 151 (1997). Here, trial testimony established that Weatherford strangled King and that she sustained multiple external abrasions, internal hemorrhaging, and brain swelling as a result of the attack. King's autopsy revealed that she sustained multiple blunt-force injuries to her head. Despite Weatherford's alternate version of events wherein he intended to mend his relationship with King and had merely tussled with her, the jury could have reasonably inferred that Weatherford acted with the purpose of causing King's death. *See id.* at 117, 952 S.W.2d at 151 (holding that "the jury could have easily inferred from the numerous

8

blunt force injuries to the victim's skull, as well as from the autopsy evidence that she was strangled, that appellant acted with the purpose to cause the victim's death"). Additionally, the jury was free to consider Weatherford's changing story about his involvement in King's murder and his movement in the days leading up to the discovery of King's body as evidence of his guilt. *See Robinson v. State*, 353 Ark. 372, 381, 108 S.W.3d 622, 627 (2003) (holding that "the jury was free to consider Robinson's repeated lies to authorities and his changing stories about his knowledge of [the victim's] whereabouts" as evidence of guilt). The jury is free to believe all or part of any witness's testimony, to resolve questions of conflicting testimony and inconsistent evidence, and to believe the State's version of the facts rather than the defendant's. *Conte v. State*, 2015 Ark. 220, at 16, 463 S.W.3d 686, 696.

Thus, when considering the preceding facts and circumstances in the light most favorable to the State, we find that there was substantial evidence to support Weatherford's first-degree-murder conviction.

### 2. *Residential burglary*

Second, Weatherford was convicted of residential burglary. Pursuant to Arkansas Code Annotated section 5-39-201, a person commits residential burglary if he or she enters or remains unlawfully in a residential occupiable structure of another person with the purpose of committing in the residential occupiable structure any offense punishable by imprisonment. Ark. Code Ann. § 5-39-201(a)(1) (Repl. 2024). To "enter or remain unlawfully" means to "enter or remain in or upon premises when not licensed or privileged to enter or remain in or upon the premises." Ark. Code Ann. § 5-39-101(4)(A) (Supp.

2025). A "residential occupiable structure" is a vehicle, building, or other structure in which any person lives. Ark. Code Ann. § 5-39-101(9)(A)(i).

On appeal, Weatherford argues that the State failed to prove all the elements for residential burglary, because the specific underlying offense—i.e., the "offense punishable by imprisonment" that a defendant must intend to commit inside a residential occupiable structure to sustain a charge of residential burglary—is an element of the crime and must be identified. Weatherford asserts that the circuit court and the State considered theft, domestic battery, murder, harassment, and terroristic threatening as viable options for the jury to rely on as the underlying offense based on the facts of the case despite the fact that Weatherford had not been charged with all those crimes. Weatherford contends that the State charged him with theft of property as the underlying offense and that the circuit court did not make a finding that the State proved the elements of that specific crime.

Arkansas Rule of Criminal Procedure 33.1(a) dictates that "[a] motion for directed verdict shall state the specific grounds therefor." We have held that "[a] defendant is bound by the scope and nature of his directed-verdict motion at trial and cannot change the grounds on appeal." *Bridges v. State*, 2023 Ark. 157, at 4, 676 S.W.3d 275, 278. Here, the record demonstrates that Weatherford based his directed-verdict motions on different grounds from those raised on appeal. Specifically, Weatherford argued below that he was still considered a resident when he went through the window of King's home, that he still had belongings inside the home, and that he had to have the intent of committing a felony when entering the home to sustain a residential-burglary charge. Weatherford contended that he did not have the intent of murdering King, stealing King's car, or burglarizing King's

10

residence when he went through the window. The court denied Weatherford's directed-verdict motion. When Weatherford renewed his directed-verdict motion at the close of all evidence, he argued that he did not have the intent to burglarize the home or to commit a felony when he went into the home. Thus, Weatherford's argument raised on appeal that the specific underlying offense required to sustain a residential-burglary charge must be identified as an element of the charge was not presented to the circuit court.

Accordingly, Weatherford's arguments regarding the sufficiency of the evidence supporting his residential-burglary conviction are not preserved for our review.

### 3. *Theft of property*

Third, Weatherford was convicted of theft of property in connection with the theft of King's vehicle. Pursuant to Arkansas Code Annotated section 5-36-103, a person commits theft of property if he or she knowingly takes or exercises unauthorized control over or makes an unauthorized transfer of an interest in the property of another person with the purpose of depriving the owner of the property. Ark. Code Ann. § 5-36-103(a)(1) (Repl. 2024). A person acts knowingly with respect to the person's conduct or the attendant circumstances when he or she is aware that his or her conduct is of that nature or that the attendant circumstances exist, or a result of the person's conduct when he or she is aware that it is practically certain that his or her conduct will cause the result. Ark. Code Ann. § 5-2-202(2)(A)–(B).

Weatherford contends that evidence presented at trial showed that he and King were once in a relationship and had lived together and that the State failed to present any evidence that Weatherford exercised unauthorized control of King's vehicle. Further, Weatherford

11

argues that the fact that he admitted driving the vehicle does not mean that he intended to deprive King of the vehicle.

At trial, Weatherford based his directed-verdict motions regarding the theft-of-property charge on the allegation that he had previously purchased the vehicle from King. However, Weatherford did not present the arguments he now raises on appeal regarding the State's alleged failure to show that he had exercised unauthorized control over the vehicle or intended to deprive King of the vehicle. As discussed above, a defendant is bound by the scope and nature of his directed-verdict motion at trial and cannot change the grounds on appeal. *Bridges*, *supra*.

Accordingly, Weatherford's arguments regarding the sufficiency of the evidence supporting his theft-of-property conviction are not preserved for our review.

### 4. *Sentence enhancement*

Finally, the State alleged that Weatherford was subject to an enhanced sentence because he committed King's murder in the presence of a child. Arkansas Code Annotated section 5-4-702(a)(2) provides that a person who commits first-degree murder "may be subject to an enhanced sentence of an additional term of imprisonment of not less than one (1) year and not greater than ten (10) years if the offense is committed in the presence of a child[.]" Ark. Code Ann. § 5-4-702(a)(2) (Supp. 2025).

On appeal, Weatherford contends that the jury had to resort to speculation and conjecture in reaching the conclusion that he had committed first-degree murder in front of a child because there was no testimony that King's children were present when the crime occurred. At trial, Weatherford moved for a directed verdict regarding the sentence

enhancement at the close of the State's case, arguing that there was no direct testimony that King's murder occurred in the presence of a child. The circuit court denied Weatherford's motion, and when Weatherford renewed his directed-verdict motions after the close of all the evidence, he did not renew his argument challenging the sentence enhancement.

Arkansas Rule of Criminal Procedure 33.1(a) provides that a motion for directed verdict "shall be made at the close of the evidence offered by the prosecution and at the close of all of the evidence." Ark. R. Crim. P. 33.1(a). This court has consistently held that an appellant's failure to do so waives a challenge to the sufficiency of the evidence on appeal. *See Dickey v. State*, 2016 Ark. 66, at 3, 483 S.W.3d 287, 288–89. As discussed above, although Weatherford moved for a directed verdict on the sentence enhancement at the close of the State's case, he did not renew this motion at the close of all the evidence.

Accordingly, Weatherford's challenge to the sufficiency of the evidence supporting the sentence enhancement is waived, and we decline to address it.

### B. Custodial Statements

For his second point on appeal, Weatherford contends that the circuit court erred in denying the motion to suppress his statements to law enforcement because he did not knowingly and intelligently waive his rights, nor did he make a voluntary statement.

We have explained that "[a] statement made while in custody is presumptively involuntary, and the burden is on the State to prove by a preponderance of the evidence that a custodial statement was given voluntarily and was knowingly and intelligently made." *MacKool v. State*, 365 Ark. 416, 436, 231 S.W.3d 676, 693 (2006). To determine whether a waiver of *Miranda* rights is voluntary, knowing, and intelligent, this court looks at whether

13

the statement was the product of free and deliberate choice rather than intimidation, coercion, or deception. *Halliburton v. State*, 2020 Ark. 101, at 11, 594 S.W.3d 856, 864. To make this determination, we review the totality of the circumstances surrounding the waiver, including the age, education, and intelligence of the accused; the lack of advice as to his constitutional rights; the length of the detention; the repeated and prolonged nature of the questioning; the use of mental or physical punishment; and statements made by the interrogating officers and the vulnerability of the defendant. *Id*. The evaluation of the credibility of witnesses who testify at a suppression hearing about the circumstances surrounding an appellant's custodial confession is for the circuit court to determine, and this court defers to the position of the circuit court in matters of credibility. *Id*. Conflicts in the testimony are for the circuit court to resolve, and the court is not required to believe the testimony of any witness, especially that of the accused, since he or she is the person most interested in the outcome of the proceedings. *Id*. at 11–12, 594 S.W.3d at 864. So long as there is no evidence of coercion, a statement made voluntarily may be admissible against the accused. *Id*. at 12, 594 S.W.3d at 864. This court will reverse a circuit court's ruling on this issue only if it is clearly against the preponderance of the evidence. *Flowers v. State*, 362 Ark. 193, 206, 208 S.W.3d 113, 124 (2005).

As discussed above, Weatherford gave two statements to law enforcement in connection with King's murder. On December 2, 2022, the circuit court held a hearing on Weatherford's motion to suppress his December 5, 2019, statement to law enforcement wherein he confessed to King's murder. At the hearing, Investigator Brown testified that Weatherford appeared to be coherent during the interview, did not have slurred speech,

14

and did not appear to be under the influence of any kind of intoxicants. Brown testified further that Weatherford was not threatened or coerced during the interview; that Weatherford never indicated that he was unable to understand what was being discussed; that Weatherford did not seem confused; and that Weatherford did not ask for an attorney or attempt to stop the questioning. On cross-examination, Brown testified that although he knew that Weatherford had talked to another officer the day before, he did not know whether Weatherford had claimed to be off his medication or under the influence of alcohol at the time of that prior interview. Weatherford's counsel asked Brown whether he had investigated Weatherford's background or was aware of certain information such as Weatherford's ability to read, his IQ score, or the fact that he had been receiving disability checks from a young age. Brown explained that Weatherford did not raise any of these issues during the interview and that nothing about Weatherford's appearance or demeanor during the interview led him to believe that Weatherford could not read or write, had "IQ problems," or had been declared disabled. The circuit court concluded that Weatherford's September 5 statement was voluntary. Specifically, the court took into account the completed statement-of-rights form and the recorded statement during which Weatherford's rights were read to him, as well as the fact that Weatherford had experience with the criminal-justice system. Further, the circuit court noted Weatherford's statement that he understood his rights, that he never asked for an attorney, and that he had a calm and coherent demeanor.

On December 12, 2022, during a break at trial, the circuit court held a hearing on Weatherford's motion to suppress his December 4, 2019 statement to law enforcement.

15

During the hearing, Special Agent Pierce testified that he read Weatherford his *Miranda* rights and that Weatherford indicated that he did not understand the word "coerce," so Pierce explained it to him.[2] Pierce testified that Weatherford did not appear to have any difficulty understanding after that, that Weatherford signed the statement-of-rights form, and that he placed his initials next to each individual statement of rights. Pierce testified further that Weatherford was not threatened during the interview, that he did not appear to be under the influence, and that he did not attempt to invoke his right to counsel. Pierce testified that Weatherford indicated during the interview that he had been arrested previously. On cross-examination, Pierce stated that he had not spoken to Weatherford's arresting officer and did not know if Weatherford had been drinking at the time of his arrest. Pierce testified further that he was not aware of Weatherford's prior IQ scores, but he knew that Weatherford had trouble reading because he had told him so during the interview. However, Pierce testified that when Weatherford stated that he did not understand the word "coerce," he told Weatherford, "I'm not sitting here milking your mouse"—a phrase that Pierce believed to be commonly understood—in an attempt to explain to Weatherford that he was not trying to force Weatherford to do anything. Pierce believed that Weatherford understood his rights because Weatherford said he understood them and because Weatherford had a high school diploma. The circuit court denied Weatherford's motion to suppress, taking into consideration that Weatherford had been arrested before and was familiar with the criminal-justice system; stated that he understood his rights; and at no time

---

[2]Relevant here, the waiver portion of the statement-of-rights form provides that "[n]o promises or threats have been made to me and no pressure or coercion of any kind has been used against me."

appeared hesitant or tried to stop the interview. The circuit court noted that the recorded interview demonstrated that Weatherford made a voluntary statement, which was verified by Pierce.

On appeal, Weatherford contends that he did not knowingly and intelligently waive his rights or make a voluntary statement on September 4 because he told the interviewer that he could not read well, that the word "coerce" was never truly explained to him even though he informed the interviewer that he did not understand its meaning, and that the interviewer was not aware of his alleged low IQ score. Similarly, Weatherford contends that he did not knowingly and intelligently waive his rights or make a voluntary statement on September 5 because the interview was approximately two hours long, and because the officers conducting the interview did not know that Weatherford had allegedly been off his medication and had consumed alcohol the day prior; whether Weatherford could read; that Weatherford had allegedly received low IQ scores in the past; that Weatherford had allegedly been receiving disability checks since he was young; and that Weatherford had allegedly been in special-education classes throughout school. The State responds that the circuit court's denials of Weatherford's motions to suppress his statements were not against the preponderance of the evidence.

Based on the totality of the circumstances, we conclude that Weatherford's statements were both given voluntarily and made knowingly and intelligently. Weatherford does not argue that his statements to law enforcement were the product of intimidation, coercion, or deception. Rather, he hinges his argument on the assertion that he did not knowingly or intelligently waive his rights due to a variety of factors such as his alleged low

IQ score, inability to read well, and receipt of disability checks from an early age. Although it is unsupported by the record, Weatherford also represents that he was off his medication and under the influence of alcohol during his September 4 interview. We are not persuaded by Weatherford's position. Weatherford graduated from high school and had prior experience with the criminal-justice system. He was formally Mirandized by law enforcement at the outset of both interviews, and during both interviews, Weatherford indicated that he understood his rights by signing the statement-of-rights form and placing his initials beside each individual right. During Weatherford's September 4 interview, he demonstrated his ability to read portions of the statement-of-rights form, and despite his argument that the word "coerce" was not truly explained to him, Weatherford did not appear to have any additional difficulty understanding after Pierce attempted to explain the meaning of the word. Weatherford later demonstrated his understanding of his *Miranda* rights when he elected to stop the interview. Both Pierce and Brown testified that Weatherford did not appear to be under the influence during his interviews and that they believed he understood his rights.

Accordingly, we are satisfied that the circuit court did not err in allowing Weatherford's custodial statements into evidence.

C. Autopsy Photographs

For his third point on appeal, Weatherford contends that the circuit court abused its discretion in allowing certain autopsy photographs into evidence because, he claims, the photographs were more prejudicial than probative pursuant to Arkansas Rule of Evidence

18

403.[3] The admission of photographs is a matter left to the circuit court's sound discretion, which we will not reverse absent an abuse of discretion. *Mackrell v. State*, 2022 Ark. 93, at 8, 643 S.W.3d 12, 18–19. Abuse of discretion is a high threshold that does not simply require error in the circuit court's decision but requires that the circuit court act improvidently, thoughtlessly, or without due consideration. *Arnold v. State*, 2022 Ark. 191, at 7, 653 S.W.3d 781, 787.

Photographs are generally admissible if they help explain testimony. *Mackrell, supra*. The mere fact that a photograph is inflammatory or cumulative is not, standing alone, sufficient reason to exclude it. *Id*. We have said that even the most gruesome photographs may be admissible if they assist the trier of fact in any of the following ways: (1) by shedding light on some issue; (2) by proving a necessary element of the case; (3) by enabling a witness to testify more effectively; (4) by corroborating testimony; or (5) by enabling jurors to better understand the testimony. *Id*. Other acceptable purposes include showing the condition of the victim's body, the probable type or location of the injuries, and the position in which the body was discovered. *Id*. Finally, we have explained that if a photograph serves no valid purpose and can only result in inflaming the passions of the jury, it is inadmissible. *Id*.

Prior to Dr. Adam Craig's testimony at trial, the court held a hearing on Weatherford's motion in limine to exclude certain autopsy photographs. In his motion, Weatherford argued that the State had introduced numerous cumulative photos showing

---

[3]Rule 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Ark. R. Evid. 403.

King's injuries and that the use of such a significant number of similar images may overwhelm the jury and lead to unfair prejudice. At the hearing, the circuit court was presented with thirty autopsy photos and informed the parties that it would review each photo to determine the probative value versus any prejudicial effect. Craig was called to testify at the motion in limine hearing as to the purpose of each photo. During the hearing, the circuit court excluded two of the challenged photographs because they were either similar to other photos that were admitted or were unnecessary to explain injuries sustained by King. However, Weatherford objected to eight other photos that were ultimately allowed by the circuit court after Craig's testimony. First, Weatherford objected to four photos depicting King's scalp pulled forward and backward to show internal hemorrhaging, arguing that the photos were "really upsetting to look at" and more prejudicial to the defendant than probative. Craig explained that he could describe the head trauma—which was listed as part of King's cause of death—but it would be easier to show the photos to the jury. The circuit court ruled that the four photos could be admitted because they would assist the jury in understanding Craig's expert testimony and show the condition of King's body. Next, Weatherford objected to two photos depicting King's brain after it had been removed during her autopsy, arguing that the photos were graphic and far more prejudicial than probative. However, Craig explained that the photos show the flattening of the surface of the brain caused by cerebral edema. The circuit court ruled that the two photos could be admitted because they would help explain Craig's testimony to the jury. Weatherford then objected to two photographs depicting King's neck dissection that were meant to identify internal hemorrhaging, arguing that the photos were grotesque and only served to inflame

the jury. Craig explained that these photos showed internal injuries, as opposed to the external, superficial injuries shown in other autopsy photos, and that the photos described the injuries better than he could. Craig asserted that the photos demonstrated that the internal injuries were caused by "a certain degree of force." The circuit court ruled that the two photos could be admitted because they would assist the jury in understanding the testimony and allow Craig to testify more efficiently.

On appeal, Weatherford argues that there was no valid purpose to admit State's exhibits 113–120—the photos depicting King's scalp pulled forward and backward, King's brain, and King's neck dissection performed during King's autopsy—and that they no doubt inflamed the jury due to their gruesome nature. Weatherford likens his case to *Berry v. State*, 290 Ark. 223, 718 S.W.2d 447 (1986), and urges this court to find that admission of these photos was so prejudicial that it prevented him from having a fair trial. The State responds that *Berry* is distinguishable because, unlike the present case, it was uncontroverted that the appellant in that case was an accomplice and did not directly inflict the injuries on the victim and that most of the photos were cumulative. The State also contends that the circuit court weighed the probative value of each autopsy photo, which demonstrates that the court did not abuse its discretion in allowing the relevant photos into evidence.

We are not persuaded by Weatherford's reliance on *Berry*. In *Berry*, it was undisputed that the victim's death was the result of an assault by Berry's boyfriend and that Berry herself was an alleged accomplice to the crime. 290 Ark. at 225, 718 S.W.2d at 448–49. We concluded that the carte blanche introduction of six "mostly repetitious, gory color photographs of the victim's face" into evidence was erroneous in part because the

21

photographs "did nothing to rebut a defense by the appellant or to clarify the cause of death" when the main issue at trial was whether Berry had helped her boyfriend plan the crime. *Id.* at 233, 718 S.W.2d at 453. In contrast, Weatherford alone inflicted the injuries on King, and the main issue at trial was whether Weatherford purposely caused King's death. Unlike the circuit court in *Berry*, the circuit court here carefully considered each autopsy photo in conjunction with Craig's testimony in order to assess its probative value versus the prejudicial effect. The circuit court did not accept all thirty photos carte blanche; rather, it excluded two of the photos that Weatherford objected to and explained its reasoning for permitting the introduction of the remaining photos. Craig then used the photos to more effectively explain his autopsy findings and show the jury the extent of King's injuries, including internal hemorrhaging to the scalp caused by blunt-force trauma to her head, internal hemorrhaging to her neck caused by strangulation, and the flattening of King's brain caused by cerebral edema—all of which contributed to King's cause of death.

Based on the foregoing, we cannot say that the circuit court abused its discretion in allowing State's exhibits 113–120 into evidence.

D. Mitigating Sentencing Evidence

For his fourth and final point on appeal, Weatherford contends that the circuit court abused its discretion by excluding mitigating sentencing evidence. Circuit courts have broad discretion on evidentiary issues, and we will not reverse a circuit court's ruling on the admission of evidence in the absence of an abuse of discretion. *Collins v. State*, 2019 Ark. 110, at 5, 571 S.W.3d 469, 471–72.

During the sentencing phase of Weatherford's trial, Weatherford sought to introduce various documents that he had previously provided to an expert witness as mitigation evidence. The documents included Weatherford's school records and a social history chronology detailing his schooling and disability history. The State objected to the introduction of this evidence, asserting that it had requested the very same information from defense counsel in 2021 but did not receive it until after court had adjourned on the eve of sentencing. The circuit court allowed Weatherford to proffer the documents for purposes of the record but ruled that the documents could not be introduced because, consistent with its standard position regarding discovery issues, the case had been pending for a little over three years, and Weatherford was improperly attempting to provide the documents after the trial had already begun.

On appeal, Weatherford argues that he was not required to provide the relevant mitigation evidence to the State. Additionally, Weatherford contends that the State failed to demonstrate any prejudice that resulted from not receiving the mitigation evidence in advance, as the State had all night to review the school records and social-history chronology before sentencing and could have asked the court for a recess to review the documents. The State responds that it was within the circuit court's discretion to prohibit Weatherford from introducing the evidence, particularly when there was no dispute that the relevant documents had been specifically requested by the State well before trial.

From our review of the record before us, we cannot say that the circuit court abused its discretion in excluding Weatherford's school records and social-history chronology from evidence. At trial, Weatherford's counsel acknowledged that this mitigation evidence had

been previously provided to a potential expert witness that the State had subpoenaed. The State contends that it requested that same evidence in 2021, and Weatherford's counsel did not refute that claim. Ultimately, the circuit court adhered to its standard position on the admission of evidence, ruling that Weatherford's mitigation evidence was inadmissible due to the fact that he sought to admit the documents at too late a juncture. Weatherford has not demonstrated that the circuit court acted improvidently, thoughtlessly, or without due consideration. Accordingly, we affirm the circuit court's ruling on this point.

### III. *Rule 4-3(a) Review*

Pursuant to Arkansas Supreme Court Rule 4–3(a), the record has been reviewed for all objections, motions, and requests that were decided adversely to Weatherford, and no prejudicial error was found.

Affirmed.

Special Justices MARK ALLISON and DAVID PARKER join.

WOOD and BRONNI, JJ., not participating.

*Erin W. Lewis*, for appellant.

*Tim Griffin*, Att'y Gen., by: *David L. Eanes, Jr.*, Ass't Att'y Gen., for appellee.

24